IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

DARLENE MOORE,                        )
                                      )
              Plaintiff,              )
                                      )
        v.                            )   Case No.
                                      )   07-0318-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
              Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Darlene Moore seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that (1)
the ALJ erred in failing to give controlling weight to treating
physician Cynthia Glass, (2) the ALJ erred in finding that
plaintiff's skin ulcers were not a severe impairment, (3) the ALJ
improperly evaluated plaintiff's credibility, and (4) the ALJ
erred in failing to make a specific residual functional capacity
finding.  I find that the substantial evidence in the record as a
whole supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On September 2, 2004, plaintiff applied for disability
benefits alleging that she had been disabled since March 2, 2001.

During the hearing she amended her alleged onset date to September 30, 2003.  Plaintiff's disability stems from high blood pressure, migraines, and obesity.  Plaintiff's application was denied on November 2, 2004.  On August 8, 2006, a hearing was held before an Administrative Law Judge.  On October 18, 2006, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On March 22, 2007, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876

2

F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion

shifts to the Commissioner to establish that there is some other

type of substantial gainful activity in the national economy that

the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo.

2000).

The Social Security Administration has promulgated detailed

regulations setting out a sequential evaluation process to

determine whether a claimant is disabled.  These regulations are

codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step

sequential evaluation process used by the Commissioner is

outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.   Is the claimant performing substantial gainful
activity?

              Yes = not disabled.
              No = go to next step.

    2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits her ability
to do basic work activities?

              No = not disabled.
              Yes = go to next step.

    3.   Does the impairment meet or equal a listed impairment
in Appendix 1?

              Yes = disabled.
              No = go to next step.

    4.   Does the impairment prevent the claimant from doing
past relevant work?

Case 4:07-cv-00318-REL   Document 12   Filed 03/12/08   Page 4 of 64

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

    5.    Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Disability Report**

When plaintiff filed her disability report on September 15, 2004, she listed anemia as the condition that limits her ability to work (Tr. at 58).  When asked how her illness limits her ability to work, plaintiff wrote, "I can't keep a job due to my illness and frequently have to be ho[s]pitalized." (Tr. at 59). Plaintiff was asked in this form if she had ever been seen by a medical professional for emotional or mental problems that limit her ability to work, and she wrote, "No" (Tr. at 61).

**Function Report**

In a function report dated September 22, 2004, plaintiff was asked to describe what she does during the day.  She wrote:

5

> It's difficult getting out of bed due to the pain in my
> lower back and knee. I keep a constant pain in my eyes.
> Feels like a nagging pain. I clean up myself, cook a little
> something to go with take my daily a.m. meds. Then I clean
> house and go job hunting by going to the Full Employment
> Council or check through the paper myself to try to find
> employment that would fit in with my time frame for my job
> to receive my full health to do the job. Then return home
> to fix dinner.

(Tr. at 66).

Plaintiff reported that she takes care of her mother who had a stroke several years ago and has had several surgeries (Tr. at 67). Plaintiff prepares her own meals, does laundry, cleans the house, organizes things in the house, all without assistance (Tr. at 68). Plaintiff goes out often, riding in a car or using public transportation (Tr. at 69). She is able to drive (Tr. at 69). Plaintiff shops but wrote that she does not do much shopping because she has no source of income (Tr. at 69). Her hobbies include reading and watching television (Tr. at 70). She visits with her family as often as possible (Tr. at 70).

When asked to circle which items her condition affects, plaintiff circled walking, kneeling, climbing stairs, squatting, bending, and memory (Tr. at 71). She did not circle standing, sitting, reaching, lifting, talking, completing tasks, concentration, understanding, following instructions, using her hands, or getting along with others (Tr. at 71). She wrote that she can walk 1/2 mile before needing to rest for ten to 15

6

minutes (Tr. at 71).  She can pay attention for 1 to 1 1/2 hours,
but she also noted that she is able to finish what she starts,
such as a conversation, chores, reading, or watching a movie (Tr.
at 71).  She is able to follow written instructions "very well"
and is able to follow verbal instructions "very well" (Tr. at
71).

**Supplement - Medical History - DFS Medical Evaluations**

In an undated DFS Medical Evaluations form completed by
plaintiff, she wrote that she gets blood transfusions every two
weeks (Tr. at 168).

**B.    *SUMMARY OF MEDICAL RECORDS***

On March 8, 1999, plaintiff saw N. Preston Forester, M.D.,
for a check up (Tr. at 229).  "She has run out of her pain
medication and nerve medication.  She has been under a great deal
of stress recently with injury and assault that her son had
during school hours.  She states her son was assaulted by another
young man.  He was blind-sided and hit on the right side of his
jaw and sustained a fracture to his jaw bone."  Dr. Forester
assessed acute and chronic anxiety state and migraine syndrome.
He prescribed Tylenol #3 (with codeine, a **narcotic** analgesic) and
Valium[1].

---

[1]A benzodiazapine used to treat anxiety and muscle spasms.

On May 3, 1999, plaintiff saw N. Preston Forester, M.D., for a check up (Tr. at 228). He assessed chronic migraine syndrome and chronic anxiety state. He prescribed Tylenol #3 (with codeine, a **narcotic** analgesic) and Valium.

On June 21, 1999, plaintiff saw N. Preston Forester, M.D., for head congestion (Tr. at 227). He assessed acute sinusitis, headache secondary to acute sinusitis, and restless leg syndrome. He prescribed Biaxin (antibiotic), Claritin D (antihistamine), Plendil (for hypertension), Valium, Elavil (an antidepressent, also known as amitriptyline), and Tylenol #3 (with codeine, a **narcotic** analgesic).

On August 2, 1999, plaintiff saw N. Preston Forester, M.D., for a check up (Tr. at 226). He assessed peripheral edema[2], mild sinusitis, essential hypertension, and chronic anxiety state. He prescribed Aldactazide (for hypertension), Claritin D, Plendil, Tylenol #3 (with codeine, a **narcotic** analgesic), and Valium.

On September 1, 1999, plaintiff saw N. Preston Forester, M.D., for a follow up (Tr. at 225). He assessed chronic anxiety state and chronic migraine syndrome. He prescribed Tylenol #3 (with codeine, a **narcotic** analgesic), Valium, Levaquin (antibiotic), Prevacid (reduces acid production in the stomach), and Axid (decreases the amount of acid in the stomach).

_____

[2]Abnormal buildup of fluid in the ankles, feet, and legs.

8

On October 25, 1999, plaintiff saw N. Preston Forester, M.D., for a check up (Tr. at 223). "Since the accident on 09/16/99[3], the patient states that she has had a considerable amount of painful discomfort above the right buttock radiating down the right leg." Dr. Forester assessed acute lumbar sprain secondary to trauma, chronic GI complaints of undetermined etiology, and chronic anxiety state. He prescribed Tylenol #3 (with codeine, a **narcotic** analgesic), Motrin 800 mg, and Flexeril, a muscle relaxer.

On November 1, 1999, plaintiff saw N. Preston Forester, M.D., for a check up (Tr. at 222). She reported continuing pain on transferring in and out of bed and going from sitting to a standing position. "She does not wish to try any physical therapy at this time." Dr. Forester assessed acute and chronic lumbosacral sprain and spasms of the right thigh muscles. He kept her on her current medications (which had included Tylenol #3, a **narcotic** analgesic) and "[s]he was advised to stay off her job."

On November 8, 1999, plaintiff saw N. Preston Forester, M.D., for a follow up on lower back and right leg extremity pain (Tr. at 221). "She indicates that she can sit down and stand for

_____

[3]There are no records of hospital or doctor visits on September 16, 1999; therefore, I am unclear what accident Dr. Forester was referring to.

Case 4:07-cv-00318-REL   Document 12   Filed 03/12/08   Page 9 of 64

approximately 2-4 hour time spans at the present time. I feel
that she has recovered sufficiently to be able to attempt to
return to work on 11/09/99. I will fill out a work release and
let her go back today and see how she tolerates this. She denies
any other complaints today." He assessed chronic lumbosacral
sprain, chronic right lower extremity pain secondary to trauma,
and multiple muscle contusions improved. He kept her on her
present medications, which had included Tylenol #3, a **narcotic**
analgesic.

On January 31, 2000, plaintiff saw N. Preston Forester,
M.D., for a follow up on her headaches (Tr. at 219). He noted
that she had undergone an MRI which was normal. She reported
some muscle pain her neck and asked to be started on Elavil[4].
Dr. Forester assessed chronic headache, etiology undetermined;
chronic anxiety state; and essential hypertension. He started
her on Adalat and Hyzaar (both for blood pressure), and he gave
her a prescription for Elavil.

On February 7, 2000, plaintiff saw N. Preston Forester,
M.D., for follow up on her headaches (Tr. at 218). "She states
that the headaches are slightly improved. . . . She has had no
other symptoms." He assessed chronic headache, essential

---

[4]Also known as amitriptyline, an antidepressant.

hypertension, and chronic anxiety.  He told her to continue taking her current medications, which had included Tylenol #3, a **narcotic** analgesic.

On April 19, 2000, plaintiff saw N. Preston Forester, M.D., for abdominal pain (Tr. at 217).  "She has run out of her Hyzaar [blood pressure medicine] and will need to have some allergy medication (Claritin) which she takes as needed.  She denies any other symptoms today."  Dr. Forester assessed mild hypertension and chronic anxiety state.  He told her to continue her current medications, which had included Tylenol #3, a **narcotic** analgesic.

On June 6, 2000, plaintiff saw N. Preston Forester, M.D., for abdominal pain (Tr. at 215).  She was somewhat anxious.  "She is not on her nerve medication at the present time."  Dr. Forester prescribed Valium.

On July 19, 2000, plaintiff saw N. Preston Forester, M.D., for a follow up (Tr. at 214).  "She has run out of her nerve medication. . . .  She has also run out of her antihypertensive medication. . . .  When last seen by Dr. Stubblefield her blood pressure was markedly elevated.  She indicated to him that she [had] not been taking her blood pressure medication but has since started back on it, and her blood pressure has improved."  Dr. Forester assessed essential hypertension, status post abdominal surgery, and chronic anxiety state.  He prescribed Valium.

11

On August 30, 2000, plaintiff saw N. Preston Forester, M.D., for nervousness (Tr. at 213). She said she was quite nervous and anxious over her job. She was told by her gynecologist she could go back on August 1, but her job now states that she could have come back to work several weeks earlier. She has had increasing anxiety because of a problem with her family members also. Dr. Forester assessed chronic anxiety and prescribed Valium and Tylenol #3 (with codeine, a **narcotic** analgesic).

On September 28, 2000, plaintiff had an abdominal series due to abdominal pain, and no abnormalities were seen (Tr. at 212).

On October 11, 2000, plaintiff saw N. Preston Forester, M.D., for migraine headaches (Tr. at 211). Dr. Forester prescribed Tylenol #4 (with codeine, a **narcotic** analgesic), Flexeril, and Valium.

On November 22, 2000, plaintiff saw N. Preston Forester, M.D., for a follow up on her migraine headaches (Tr. at 210). "She has run out of her pain and nerve medication. She is back to work now and working on a daily basis." Dr. Forester assessed chronic migraine headaches, essential hypertension, and chronic anxiety state. He renewed her prescriptions for Valium and Tylenol #4 (with codeine, a **narcotic** analgesic).

On December 18, 2000, plaintiff saw Samuel Lehman, M.D. (Tr. at 204). "The patient has been seen for neck and shoulder pain,

as well as headaches, with difficulty functioning at times because of her symptoms. . . . More recently, she had a full hysterectomy with removal of more intestine. In 1983, the patient did have ulcer surgery, with removal of part of her stomach and part of her intestine as well." Plaintiff had been taking amitriptyline (an antidepressant) which had not been effective. "She most recently had an accident in which when getting into her car, she hit her left hip and then hit the right side of her head. She saw spots but was not actually knocked out, but her headaches have increased since then."

Dr. Lehman observed markedly tight paraspinal and trapezius muscles bilaterally. There was full power in her arms and legs, normal reflexes, normal coordination, normal gait, and normal sensation. Dr. Lehman ordered blood work.

On December 22, 2000, plaintiff had an abdomen series due to abdominal pain, and everything was normal (Tr. at 207).

On December 28, 2000, plaintiff saw Samuel Lehman, M.D. (Tr. at 203). Her comprehensive metabolic panel was normal. Her sed rate[5] was 60. Plaintiff's white blood cell count was high. She

---

[5]A sedimentation rate is common blood test that is used to detect and monitor inflammation in the body. The sedimentation rate is also called the erythrocyte sedimentation rate because it is a measure of the red blood cells (erythrocytes) sedimenting in a tube over a given period of time. The normal sedimentation rate (Westergren method) for males is 0-15 millimeters per hour, females is 0-20 millimeters per hour.

Case 4:07-cv-00318-REL   Document 12   Filed 03/12/08   Page 13 of 64

reported very severe headaches.  She was taking Tylenol #4 (with codeine, a **narcotic** analgesic) for her headaches and was on Celexa (antidepressant).  "She is under a lot of stress on her job."  Dr. Lehman did an MRI and noted maxillary sinus changes.  Her physical exam was normal.  He gave her a five-day course of Bactrim DS (antibiotic) and refilled her prescription for Tylenol #4 (with codeine, a **narcotic** analgesic), "with a view toward tapering off of it.  I did indicate to her that the philosophy of this clinic is not to use narcotic analgesics."

On January 11, 2001, plaintiff saw Dr. Lehman (Tr. at 202).  She reported continuing severe headaches, migraine in nature.  "The patient has had extensive abdominal surgery and a question of a B12 deficiency was raised by her findings.  The lab test that I have showed a sed rate of 60. . . .  I think it would be prudent for her to go on B12. . . .  I filled out her medical leave form."

On January 19, 2001, plaintiff had a CT of her head which was normal (Tr. at 206).

On Monday, January 22, 2001, plaintiff saw Dr. Lehman (Tr. at 201).  Plaintiff reported that she had gone to the emergency room early Saturday after her arm started going numb.  A CT scan of her head was normal.  "On exam today, the patient has pain on

14

extension and flexion of her neck."  Dr. Lehman requested an MRI of plaintiff's cervical spine.

On February 5, 2001, plaintiff saw Samuel Lehman, M.D. (Tr. at 200).  "She is not doing well.  She continues to have a great deal of pain in her neck and shoulders and back.  Her sed rate was elevated to 60.  I have written her a note today for part-time duties, no more than 20 hours a week.  She sits at a computer station all day.  I recommended that she have a 15 minute break about every two hours.  I have refilled her prescription for Tylenol #4 [a **narcotic** analgesic], #60, and I have given her a prescription for a Medrol-Dosepak [steroid]."

March 2, 2001, is plaintiff's original alleged onset date, although it was amended to September 30, 2003.

On March 7, 2001, plaintiff saw N. Preston Forester, M.D., complaining of cold and congestion for the past week (Tr. at 205).  She "has been unable to go back to work since last Friday. She had contacted our office on several occasions and had medication called in but did not get the prescription filled." Dr. Forester assessed acute upper respiratory infection and acute bronchitis.  He prescribed Phenergan with codeine (a **narcotic** analgesic) and Tylenol #3 (with codeine, a **narcotic**), and released her to return to work on Monday, March 12, 2001.

15

On November 7, 2002, plaintiff saw Cynthia Glass, M.D., for a follow up of migraines (Tr. at 118). Plaintiff reported getting migraines every day, but said they respond to Percocet (acetaminophen and oxycodone, a **narcotic** pain reliever). Plaintiff had tried Tryptophen (an amino acid) but alone it did not completely get rid of the eye pain. "Discussed that long-term Percocet was not an option."

Dr. Glass observed tenderness in the posterior neck muscle. She assessed migraine headaches. "Discussed cervical muscle relaxation and pathophysiology of both kinds of headaches." Plaintiff was given samples of Tryptophen and Soma (muscle relaxer)and another prescription for MS Contin (morphine, a **narcotic** pain reliever).

On January 8, 2003, plaintiff saw Steven Arkin, M.D., a neurologist, for evaluation of persistent daily headaches with occasional severe headaches (Tr. at 86-87). Dr. Arkin noted that plaintiff had a history of deficiency anemia "who really does not comply with her iron medication". Plaintiff reported her headache starts with a visual aura of dark spots before her eyes which lasts for about 30 minutes prior to having a cramping in her neck radiating into the retro orbital region. Within about two hours, she has a steady pain which is non-throbbing and not sharp but is associated with nausea and vomiting with

16

lightheadedness, photophobia and phonophobia.  Occasionally her
left arm will feel limp.

"She has had an MRI of the brain which has been
unremarkable.  She has severe headaches about once every five
days.  She has been using daily Percocet at least 4 tablets per
day over the past two months.  She was using other narcotics
before that such as Tylenol #3 and Hydrocodone as well as MS
Contin.  She has also tried Tryptophen, Soma, Vioxx, Skelaxin all
without benefit in terms of abortive care.  She has tried
Amitriptyline (antidepressant) which caused too much sedation.
Trazodone (antidepressant) did not work.  She was initially on
Atenolol (for hypertension) and then switched to Inderal (for
hypertension) which did not work.  She is currently on a
titrating dose of Topamax (treats headaches) currently at 100 mg
at h.s. [bedtime]  She is tolerating the Topamax well. . . .  She
takes Zanaflex [muscle relaxer] prn [as needed] about three times
per week to help her sleep; 8 mg seems to help.  I asked her why
she does not take it on a daily basis.  She says that she does
not want to take too much medication.  In terms of her headaches,
it seems to increase with activity. . . .  She has tried her own
type of physical therapy with a vibrator and massage.  This does
seem to help when the headache is relatively dull.  It does not
help when it is severe.  Generally the Percocet help in about one

17

hour. . . . Unfortunately, she is now using Percocet on a daily basis. In fact, she ran out just a couple days ago and probably is having **withdrawal effects** right now. We talked about the need not to use narcotics on a daily basis for this particular entity. Instead, I would like to try another long acting anti-inflammatory in conjunction with prophylaxis with Topamax, increasing that dose. I have given her Phenergan[6] to be taken 25 to 50 mg as her rescue medication. Hopefully she can tolerate being a bit drowsy. For example, she will not drive with the Phenergan on board. I would like to use Percocet (a **narcotic**) only 2-3 times weekly sporadically if possible."

On January 23, 2003, plaintiff saw Steven Arkin, M.D., for a follow up on her headaches (Tr. at 85). "She continues to have her headaches despite increasing Topamax to 125 mg at h.s. [bedtime]. We also started Phenergan which she takes 25 mg during a headache. This really has not helped her. In fact, she feels somewhat nauseated. We had also added Bextra 10 mg at h.s. Perhaps the combination is supplying her nausea. She continues to take Percocet (a **narcotic**) every morning because she wakens [with] a relatively severe retroorbital headache. We again

---

[6]A medication for nausea, which is sometimes combined with codeine, a **narcotic** pain reliever.

18

talked about rebound effect. She completely ran out of Percocet and did not take any this morning. She does have a headache.

"After full review, I decided to stop the Bextra and reduce the Topamax back to 100 mg at h.s. but add Zonisamide[7] 100 mg nightly. She does report that she has incredible difficulty falling asleep being very uncomfortable. I wonder about a sleep disorder such as sleep apnea and restless leg syndrome. Perhaps a formal sleep study would help the situation. If found, then we might add either a benzodiazepine or direct dopamine agent such as Mirapex or Requip. For now, I would like to see how she does on Zonisamide which does have sedating qualities. I believe if her sleep improves, she might do much better anyway."

On April 2, 2003, plaintiff had lab work done (Tr. at 137). All of her iron studies were abnormal.

On April 15, 2003, plaintiff saw Dr. Glass, complaining of daily headaches and trouble sleeping (Tr. at 117). "Encouraged use of Trazodone which she says does help her sleep. . . . She was given another prescription of Percocet (a **narcotic**), was instructed that the goal will be to get off this medication. . . . Discussed possibility of depression." Dr. Glass observed tenseness and tenderness in the posterior neck muscle. She

---

[7] A sulfa drug used to treat epilepsy.

assessed chronic muscular headache and told plaintiff to take Soma at night.

On April 17, 2003, plaintiff had an endoscopy due to iron deficiency anemia and history of previous surgery for peptic ulcer disease (Tr. at 89-90, 128-129). A nodule was found in mid stomach which was biopsied. Wendell Clarkston, M.D., assessed gastritis and recommended Prevacid while awaiting the biopsy results. Plaintiff also had a colonoscopy; however, Dr. Clarkston recommended a an air-contrast barium enema due to poor colon prep (Tr. at 128). No large lesions were seen.

On April 30, 2003, plaintiff saw Wendell Clarkston, M.D., on referral from Dr. Glass (Tr. at 126). "She has a history of profound iron-deficiency anemia and recent endoscopy showed evidence of inflammation and ulceration. . . . A colonoscopy was performed which was incomplete due to a poorly prepped colon. . . . She complains of some nausea and emesis [vomiting] recently with ingestion of her iron sulfate tablets. Physical examination revealed her to be in good spirits. Vital signs are normal." Dr. Clarkston's impressions were: "Iron-deficiency anemia. . . . I recommend that she continue iron sulfate and perhaps increase the dose to 3 times daily when better tolerated. . . . I have recommended Reglan[8] 10 mg 3 times daily taken before meals. I

---

[8]Reglan increases the rate at which the stomach and intestines move during digestion. It also increases the rate at

have recommended she continue her Prevacid".

On June 9, 2003, plaintiff saw Dr. Glass for a follow up on headaches (Tr. at 117). Plaintiff reported that "Soma plus Percocet" is the only thing that relieved her headaches. She was sleeping a little better. Dr. Glass observed tenderness in plaintiff's posterior neck muscles. She assessed persistent muscular headache. She gave plaintiff samples of Neurontin[9] and referred her to physical therapy.

On August 11, 2003, plaintiff saw Dr. Glass after she noticed a lump in her breast (Tr. at 116). Plaintiff also reported continuing headaches. She continued to do shift work. "Advised [if] it is possible that she go to day shift, as I believe the shift work is aggravating her sleep-wake cycle and that is why we have been unable to resolve her headaches and it is detrimental to her health for her to do shift work. Also has been having some anxiety and depression symptoms. This may be contributed to by her sleep disturbance." Dr. Glass assessed sleep disturbance, headaches, hypertension not well controlled,

---

which the stomach empties into the intestines and increases the strength of the lower esophageal sphincter (the muscle between the stomach and esophagus).

[9]Neurontin affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. The exact way that it works is unknown.

and breast mass.  Dr. Glass referred plaintiff to physical therapy and the Pain Center.

On August 20, 2003, plaintiff was seen at St. Luke's for a headache (Tr. at 102).  She was assessed with an acute migraine headache.  Her Percocet (a **narcotic**) was refilled and she was continued on Soma.

On September 16, 2003, plaintiff saw Cynthia Glass, M.D. (Tr. at 113).  She complained of vomiting and an inability to keep anything down for the past four days with pain in her left lower quadrant.  Dr. Glass suggested plaintiff go to the emergency room for urgent treatment and summoned an ambulance.

On September 18, 2003, plaintiff saw Dr. Glass (Tr. at 115, 196).  Plaintiff reported having episodes every month or two where she has a severe headache and vomiting.  She has chronic daily muscular headaches.  Plaintiff reported that she used Imitrex[10] in the past which worked very well.  She said the Maxalt[11] she used in the past also helped.  Dr. Glass gave plaintiff samples of Imitrex nasal spray.  She assessed nausea, vomiting, and migraine headaches.  "If does not respond to the

---

[10]Imitrex is a headache medicine.  It is believed to work by narrowing the blood vessels around the brain.  Imitrex also reduces substances in the body that can trigger headache pain, nausea, sensitivity to light and sound, and other migraine symptoms.

[11]Headache medicine which works the same way as Imitrex.

simple measures, advised that we do a full evaluation of abdominal symptoms."

On September 26, 2003, Dr. Glass wrote a letter to whom it may concern (Tr. at 114, 231). "Darlene Melson-Moore is a patient of mine with severe migraine headaches. In spite of the usual medication, her headaches are extremely difficult to control. The patient's migraine headaches are influenced by many things. It is extremely critical for her to have a normal sleep and wake cycle. Considering that her headaches are very severe and not controlled [s]he needs to work only on the day shift and not to have any alternating shift. This would greatly improve her health and productivity."

September 30, 2003, is plaintiff's amended alleged onset date.

On October 22, 2003, plaintiff saw Dr. Glass (Tr. at 113). She complained of continued headaches. "Unfortunately, her work will not allow her to work a standard day shift. This is critical for her as she must take her amitriptyline at night. It must have a regular schedule as the irregularity has been triggering some of her migraines. We discussed her use of narcotics." Dr. Glass observed that plaintiff had diffuse tenderness over her neck. She assessed headaches and neck pain.

She ordered an MRI of plaintiff's neck and cautioned her about narcotic use.

On October 27, 2003, plaintiff had an MRI of her cervical spine (Tr. at 119). Joseph Goetz, M.D., assessed mild right C3-4 neural foraminal stenosis.

On November 26, 2003, plaintiff attended physical therapy at Baptist-Lutheran Medical Center (Tr. at 122). Plaintiff's cervical range of motion was limited due to pain. Her lumbar active range of motion was within normal limits. It was recommended that plaintiff be seen for eight treatment sessions over four weeks, each lasting 30 minutes.

On December 9, 2003, plaintiff was discharged from physical therapy (Tr. at 121). "Pt. cervical mobility continued to be grossly limited secondary to headache. Pt. did report a slight decrease in pain with craniosacral techniques. Pt. has had difficulty with attendance therefore recommend discharge."

On January 30, 2004, plaintiff had a mammogram and an ultrasound of her left breast due to palpable abnormality (Tr. at 138). The mass in the left breast was benign.

On July 7, 2004, plaintiff was admitted to the hospital after having gone to the emergency room for nausea, vomiting and abdominal pain (Tr. at 139-156). Plaintiff said she had a history of similar episodes going on for the past three to four

24

years.  Despite extensive evaluation, the cause of her complaints had not been determined.  She had a similar episode a couple of weeks before that resolved after about six hours or so.  "She has a history of partial gastrectomy[12] in 1983.  She had a partial colon resection apparently for obstruction a number of years ago."  While in the hospital, she had a colonoscopy which was normal, and small bowel follow-through which was normal.  CT scans of her abdomen and pelvis were normal.  She had a nuclear medicine emptying study which was abnormal.  She was assessed with anastomotic ulcer[13] approximately 8mm "[which] probably explains the patient's nausea and vomiting."  Because of underlying anemia on admission which was clearly chronic, she was transfused two units of packed red blood cells.

On August 25, 2004, Cynthia Glass, M.D., completed a Medical Report Including Physician's Certification/Disability Evaluation (Tr. at 164-165).  She noted that she had treated plaintiff on September 16, 2003, and October 22, 2003, for headaches and neck pain.  In her summary of findings, she wrote, "Patient needs to work daytime shifts due to her medications."  It was her opinion

---

[12]Excision of part of the stomach.

[13]An ulcer of the small intestine after gastroenterostomy (establishment of a new opening between the stomach and the intestine).

25

that plaintiff did <u>not</u> have a mental and/or physical disability which prevented her from working.

On August 30, 2004, Craig Lofgreen, M.D., wrote a letter to the Division of Family Services (Tr. at 159-160, 240-241). Plaintiff presented with "numerous complaints, including chronic migraine headaches, chronic depression treated with a combination of muscle relaxers and pain medications including Darvocet [a **narcotic** pain reliever], Neurontin, Lortab [acetaminophen and hydrocodone, a **narcotic** analgesic] and Percocet [acetaminophen and oxycodone, a **narcotic** pain reliever]. She takes Elavil for her depression and as well as Zanaflex. She also indicates she takes Soma [muscle relaxer] and Reglan [see footnote 6]."

On exam, plaintiff had tenderness of the left knee, although her gait was normal. She could produce physiologic lumbosacral range of motion and reach overhead without difficulty. "She appears to suffer from some degree of arthritis involving the left knee, however, the significance of this problem is not clear. Based on her physical examination findings, it is not possible to recommend her as incapable of working. However, her description of the above medical problems may impingement [sic] significantly on her ability to secure and attend a job for the time being. Some concern also appears appropriate as regards to

26

the patient's apparently relatively heavy use of pain
medications."

On September 2, 2004, Craig Lofgreen, M.D., noted that
plaintiff's chemistry profile was normal, but her knee film
"demonstrates [an] asymmetric patella [knee cap] and some mild
medial compartment arthritic changes."

On October 26, 2004, plaintiff saw Dr. Glass due to a
ruptured blister (Tr. at 196). She was assessed with large
ulcer, etiology unknown. Dr. Glass prescribed Biaxin XL
(antibiotic).

On November 2, 2004, a DDS physician completed a Residual
Functional Capacity Assessment (Tr. at 174-181). The doctor
found that plaintiff could lift 20 pounds occasionally and ten
pounds frequently, could stand or walk about six hours per day,
could sit about six hours per day, and had an unlimited ability
to push or pull (Tr. at 175). In support of those findings, the
doctor noted that plaintiff's alleged onset date was 3/2/01, she
was previously denied on 7/5/01, and reported she stopped working
on 12/10/03. Records show only mild arthritic changes in the
left knee, and plaintiff had a normal gait. She was unable to
take her medication regularly due to working periodically on the
night shift, symptoms improved after she stopped working the
changing shifts. The doctor also noted that plaintiff walks two

27

to four miles daily, does household chores, laundry, cleans the house, cooks, drives, and uses public transportation (Tr. at 179).

On November 3, 2004, plaintiff was seen by Marcus Scarbrough, M.D., at St. Luke's Hospital for a migraine headache and right hip ulcer and pain (Tr. at 184-187). The records state, in part, as follows:

> She presented to the emergency room because of this. She was given IV fentanyl[14]. IV Compazine[15] and Kytril[16] with little relief of the pain. The headaches are exacerbated by bright lights and by noise. . . . [S]he does note, over the past several months, a history of very slowly progressive weakness and numbness in the left lower extremity. She notes a bit of weakness in the left arm but no numbness. . . . She has been . . . taking Percocet for pain. She states that Imitrex had worked in the remote history. However, because of cost, she has not been able to afford to take Imitrex and therefore has used other medicines instead. . . .
>
> . . . [A]bout four days ago she noticed a painful area on the lateral hip. It was only a blister the first day but it slowly grew. She put a Band-Aid on it and when she would take the Band-Aid off it would remove skin. It has grown to about 5-6 cm over the past 3-4 days. . . . She denies any knowledge of any spider bites. It is quite painful in the right lateral hip region.
>
> * * * * *
>
> SOCIAL HISTORY: . . . She is unemployed currently, basically disabled because she can't stand on her knees and because of her headaches. . . .

---

[14]A **narcotic** (opioid) pain medication.

[15]Treats nausea and vomiting.

[16]Treats nausea and vomiting.

28

MEDICINES:
1.  Amitriptyline 75 mg p.o. [orally] q. [every] h.s. [at bedtime]
2.  Tenormin[17] 100 mg p.o. daily
3.  Soma [muscle relaxer] 350 mg p.o. q.i.d. [four times a day]
4.  Premarin [Estrogen] 1.25 mg p.o. daily
5.  Neurontin 600 mg p.o. t.i.d. [twice a day]
6.  Zanaflex [muscle relaxer] 4 mg q. h.s.
7.  Carafate[18] 1 gram q.i.d.
8.  Maxzide [for blood pressure] one p.o. q. day
9.  Prevacid 30 mg p.o. q. daily
10. BC powder[19] 3-4 times daily

REVIEW OF SYMPTOMS:
14-points covered.  Positive for depression.  She has taken medicine for this in the past.  Elavil partially treating this per the patient. . . .  She does have some lower back pain. . . .  She has bilateral lower knee pain and occasionally her left knee will "lock up" or give out.  She notes numbness in the left lower extremity below the knee compared to the right.  This has been ongoing for about a year.  She denies any workup for this that she remembers. . . .  Over the past two weeks she has had spells where she is "dizzy" that describes the room moving.  She feels a bit funny and then will black out.  She doesn't remember after these black out spells for quite some time.  Her boyfriend, who is with her, says she is out of it a bit after these spells.  They have happened 4-5 times over the past two weeks.  Sometimes they are associated with a headache.  No workup has been performed up to this point. . . .

PHYSICAL EXAMINATION:  . . .  She appears to be [in] mild painful distress with her headache. . . .  She has a slight bit of bruising on the upper part of her forehead. . . . Strength in the upper extremities seems a bit diminished on the left with grip strength and biceps flexion.  Lower extremities -- with hip flexion and leg extension are

---

[17]Also called Atenolol, for blood pressure.

[18]Treats and prevents stomach ulcers.

[19]An over-the-counter remedy used to treat headaches and minor body aches.  It contains aspirin, caffeine, and Salicylamide (a pain reliever aid).

diminished compared to the right. . . .   Sensation is
diminished in the left lower extremity below the knee. . . .
She has an irregular stellate [star shaped] appearing wound
that is about 5.5-6 cm in diameter. . . .

LABORATORY:  This morning the white blood cell count is
elevated at 11.4. . . .

CT of the head was performed last night and results are not
available to me at this time, however, it was reported as
normal in the emergency room.

ASSESSMENT:
1.   Migraine headache.  I will try Imitrex . . . .
2.   Left lower extremity ulceration/cellulitis[20].  I am
     very suspicious of brown recluse bite based on the
     appearance of the wound. . . .  Although I am not
     convinced this is significant cellulitis, it is mildly
     red around the margin of the wound and it is very
     painful.  Continue the Ancef [antibiotic] that was
     started in the emergency room. . . .
3.   Hemoptysis[21]/shortness of breath.  I suspect this is
     likely secondary to bronchitis. . . .
4.   Left lower extremity weakness and paresthesia[22] on the
     lower leg.  Unclear what this is. . . .
5.   "Syncopal[23] spells".  This would be very much related
     to her migraine headaches. . . .
6.   Anemia. . . .

On November 22, 2004, plaintiff saw Dr. Glass (Tr. at 195).

"She continues to go to the wound care center for a large ulcer

on her lateral left thigh.  The etiology is unknown. . . .   She

---

[20]Inflammation of subcutaneous, loose connective tissue.

[21]Spitting of blood derived from the lungs or bronchial
tubes.

[22]An abnormal sensation of the skin, such as numbness,
tingling, pricking, burning, or creeping on the skin that has no
objective cause ("pins and needles").

[23]Temporary loss of consciousness.

continues to have daily headaches, she is not sleeping very well. Zanaflex helps her sleep some. Neurontin has not helped. She is having significant pain from this ulcer. Can really not stop her Percocet [a **narcotic**] now, discussed it is very important to do this for her daily chronic headaches." Dr. Glass assessed mixed headaches with daily headaches and ulcer unknown etiology. She increased plaintiff's Zanaflex, told her to start on Cymbalta (antidepressant) and gave her samples, told her to continue taking amitriptyline, and told her to taper the Neurontin.

On March 30, 2005, plaintiff saw Dr. Glass for a follow up on headaches (Tr. at 194). Dr. Glass noted that the ulcer on plaintiff's hip "ended up to be a form of herpes zoster [shingles]." It was almost healed. Plaintiff reported daily headaches and said she takes Percocet every four hours. "Had a long discussion with her in regard to rebound phenomenon and the need for pain modifiers. She has been on the Zanaflex for sometime, it has not helped. She still does not sleep well." Dr. Glass assessed chronic daily headaches, insomnia, and herpes zoster with ulcer and some postherpetic neuralgia. She increased plaintiff's amitriptyline and advised her to begin reducing her Percocet (a **narcotic**) to one and a half every four hours. "[T]he goal will be to eliminate this."

31

On June 6, 2005, plaintiff saw Cynthia Glass, M.D., for a follow up. "She continues to take several Percocet a day. She is only up to one Neurontin. Again discussed that she is having rebound headaches and we need to get off the Percocet slowly. Advised that she reduce it by one-half a pill per dosing time. We will work Neurontin up to 3 at night. If does not improve headaches, we will work on increasing to maximum 900 mg three times a day. If that fails, we will try something else. She has been having some vertiginous type symptoms for the past three weeks." Dr. Glass assessed chronic daily headaches. Dr. Glass gave her another prescription for Percocet (a **narcotic**).

On July 17, 2005, plaintiff was in a car accident (Tr. at 249-260). She said she was driving about 70 miles per hour when she looked down at the air conditioning controls. She went into the gravel and lost control of the car, which swerved 360°. She ended up going down a fairly steep embankment on the right side of the shoulder of I-70 going downhill backwards. The bumper of her car eventually struck a tree at the bottom but was traveling slowly at the time. Her car door had come open and she was trying to hold onto the door and the steering wheel. She was taken by ambulance to Western Missouri Medical Center in Warrensburg.

"Patient was ambulatory at the scene and the Concordia paramedics stated that she ambulated for a bit but noticed her right hip and knee pain and went back into the car.  The windshield and steering wheel were all intact and again there was minimal damage to the bumper of the car. . . .  [S]he did not suffer any abrasions or lacerations."  Plaintiff had tenderness with flexion-extension of her right knee and some with passive external range of motion of her right hip.  X-rays of her right hip and cervical spine were normal, x-ray of the lumbar spine showed a questionable nondisplaced hairline fracture of L5.  A lumbar spine CT was ordered due to this and it was read as negative by the radiologist.

"SS notes that the patient's family came and is in and out of the room.  SS notes that the patient is sitting up in bed and says 'it's a miracle on what drugs could do.'  Patient appears to [be] feeling better and is laughing and talking with this worker and her family in the room."  Plaintiff had been given Torodal, a non-steroidal anti-inflammatory.  When that provided no relief, she was given Stadol, a **narcotic** pain reliever similar to morphine.

Plaintiff was diagnosed with acute paracervical muscle and lower lumbar muscle strains with subsequent spasm, and contusions involving the right hip and right knee.  On discharge she was

33

told to rest, use ice, and elevate "tonight"; to avoid strenuous work for two to three days; use Motrin; and she was given a prescription for Lortab (acetaminophen and hydrocodone, a **narcotic** analgesic) 15 pills with no refills.

On July 18, 2005, someone from Western Missouri Medical Center called plaintiff and spoke with her parent (Tr. at 262). Plaintiff's parent was notified that plaintiff needed to get a CT scan of her lumbar spine and cervical spine. Dr. Glass was notified, and plaintiff's parents were told to have plaintiff follow up with Dr. Glass.

On July 19, 2005, plaintiff spoke with someone from Western Missouri Medical Center (Tr. at 261). She reported that she was still having some post neck discomfort and lower back discomfort. Plaintiff was informed of the need for a repeat odontoid view of her cervical spine and/or a CT scan of her cervical spine and re-examination, including neuro, and a following up on her lower back pain. "Encouraged pt to return here to [Western Missouri Medical Center Emergency Department] ASAP today for re-eval and other studies indicated. She does NOT want to drive or go that far. She lives in KCMO and usually goes to St. Luke's Hospital. Encouraged her to have someone drive her to SLH for re-eval ASAP or to call 911 for ambulance transport. Says she will go to SLH

34

ED [emergency department] for further evaluation and will [follow up] with her [primary care physician] Dr. Cynthia Glass."

On July 21, 2005, plaintiff saw Dr. Glass (Tr. at 193). Plaintiff had recently been in a motor vehicle accident and was having "some back pain, but not excruciating." She reported that her neck was not bothering her. Dr. Glass observed a large bruise on plaintiff's right upper thigh. She had tenderness in the lower lumbar area. Her range of motion in her neck was normal without tenderness. Dr. Glass assessed injuries following motor vehicle accident, she ordered a CT scan of plaintiff neck and back, and she prescribed Percocet, a **narcotic**.

On October 27, 2005, plaintiff saw Joseph Varriano, M.D., who took five x-rays of plaintiff's lumbar spine (Tr. at 192). "There is what appears to be a pars defect at L4-5. This has the appearance of a chronic-type injury and less the appearance of an acute injury."

On November 8, 2005, a report was prepared of a wound culture (Tr. at 296). Moderate peptostreptococcus[24] were isolated.

---

[24]These are bacteria that are found in normal and pathologic female genital tracts and blood in puerperal fever, in respiratory and intestinal tracts, in the oral cavity, and in pyogenic infections, putrefactive war wounds, and appendicitis. Its organisms are opportunistic pathogens causing bacteraemias and soft tissue infections.

Case 4:07-cv-00318-REL   Document 12   Filed 03/12/08   Page 35 of 64

On February 1, 2006, plaintiff saw Cynthia Glass, M.D. (Tr. at 190). "She was actually in as I was talking with her father about his blood pressure medication. She has had a problem over the past year almost with recurrent ulcerations of her skin. . . . [They] are always on the lower extremity and never on her mucous membranes or on her upper body. They hurt her a great deal." Dr. Glass noted that when plaintiff was in with her family a few weeks ago, she had a 4 cm ulcer on her lower leg. That had resolved, but now plaintiff had ones on her heels. She assessed recurrent leg ulcers, uncertain etiology. "Advised that she go through the phone book to find out which dermatologist takes Medicaid regardless of waiting list she is to at least initiate the process." She gave plaintiff more Percocet, a **narcotic**; increased furosemide (a diuretic) to 80 mg until plaintiff's leg swelling improved; and advised her on Jobst stockings and leg elevation.

On February 23, 2006 plaintiff had x-rays done of her left heel which were normal (Tr. at 287).

On March 14, 2006, Dr. Glass completed a physical residual functional capacity questionnaire (Tr. at 271-274). She noted that plaintiff had been diagnosed with chronic daily headaches and insomnia; that her prognosis was fair; and that her symptoms include chronic pain, fatigue, and neck pain. She was asked to

36

identify the "clinical findings and objective signs" and Dr.
Glass wrote, "chronic daily headaches, insomnia, posterior
tenderness neck muscles left side." Plaintiff's treatment had
included medications and a CT of the neck and back. Dr. Glass
wrote that plaintiff's medications can cause dizziness and
drowsiness, so she must take them at night. When asked whether
emotional factors contribute to the severity of plaintiff's
symptoms, Dr. Glass checked "yes" and identified depression as
the psychological condition. She wrote that plaintiff's symptoms
interfere with her attention and concentration "constantly".
When asked whether plaintiff would have difficulty dealing with
the stress of employment (e.g. regular and timely work schedule,
remaining on the job for eight hours, interaction with people),
she checked "no". When asked to estimate plaintiff's functional
limitations in a competitive work setting with regard to walking;
standing; sitting; and using her arms, fingers, and hands, Dr.
Glass wrote "N/A". No limitations were listed. She estimated
that due to "bad days" plaintiff was likely to miss more than
four days of work per month. She wrote, "Needs daytime hours so
as to regulate her medications as well as the side effects."

On April 5, 2006, plaintiff saw Cynthia Glass, M.D., with
her family at Dr. Glass's request (Tr. at 189). "She seems to be
sleeping better and on the whole her family thinks she is doing

37

better." The two leg ulcers had improved. She only had one remaining. She continued to have daily headaches. Dr. Glass diagnosed improving leg ulcers. "We will continue to try to reduce dosage of Percocet." She urged plaintiff to see a dermatologist.

## C. *SUMMARY OF TESTIMONY*

During the August 8, 2006, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff testified that she last worked full time in 2003 as a dispatcher (Tr. at 309). She worked two evenings, then three nights, and then one day (Tr. at 311). She was a "floater", and this changing schedule messed up her sleeping arrangements (Tr. at 311). She was unable to take medication at night because she had to work (Tr. at 311). She asked to be transferred to another department so she could work days, but her employer was unable to accommodate her because they had no openings (Tr. at 311).

Plaintiff has suffered with migraine headaches for more than 15 years (Tr. at 311). In 2000 plaintiff had surgery, and afterwards her headaches became really severe (Tr. at 312). The surgery was for a full hysterectomy, but she also wound up having

38

part of her lower intestines and some other part removed, and she had a stent put in to keep her from overbleeding (Tr. at 312).

Plaintiff now gets migraines about once or twice a week (Tr. at 312). She takes Imitrex which helps a little (Tr. at 312). The headaches last four to five hours, and she gets nauseated and usually throws up a lot (Tr. at 312). Plaintiff had her headaches just as often while she was working, but her supervisor allowed her to leave her position for several hours, usually taking her vacation time and sick time (Tr. at 313). Plaintiff tried to work for a temporary place in 2005 (Tr. at 325). Her duties were to lift boxes and set up charts (Tr. at 325). Plaintiff was required to take off work because of her impairments, and she was told they needed someone who could be more consistent at work (Tr. at 325).

Plaintiff sees Dr. Glass for headaches about once a month (Tr. at 313). She takes Imitrex orally and she has gone to the emergency room for something stronger (Tr. at 313). The last time she went to the hospital due to a headache was sometime in 2005 (Tr. at 314). She got a shot of Phenergan[25] and Demerol[26] (Tr. at 314).

_____

[25]The transcript says "Finnegrin"; however, I have not been able to find such a medication. Phenergan is a used to treat nausea and is often combined with codeine, a narcotic pain reliever.

[26]A narcotic pain reliever similar to morphine.

Plaintiff takes Reglan for stomach problems (Tr. at 314). She does not have an acid track in her stomach to break down the acid (Tr. at 314). Her medication keeps her problems at bay, but on bad days she continues to suffer with stomach cramps that cause her to double over (Tr. at 315). Plaintiff often has diarrhea (Tr. at 315). This occurs two to three times per month (Tr. at 316).

Plaintiff was in a car wreck the summer before the hearing (Tr. at 316). Plaintiff suffers from lower back pain as a result (Tr. at 317). The pain comes and goes (Tr. at 317).

About ten years ago, plaintiff began having trouble sleeping (Tr. at 317-318). She takes medication to help her sleep at night, sleeps for about six hours per night, and does not nap during the day (Tr. at 318).

Plaintiff is being treated for depression with Valium and Soma (Tr. at 324). Plaintiff's high blood pressure is kept under control with medication (Tr. at 327). She is very anemic and she usually gets a pint of blood when she goes to the doctor (Tr. at 327).

Plaintiff's medications make her dizzy and drowsy (Tr. at 327). Her energy level is very slow (Tr. at 328). Plaintiff has knee problems, and she sometimes has to work it back in when it

40

gets twisted out of joint (Tr. at 328). She also does knee
exercises (Tr. at 328).

Plaintiff lives with her parents and they buy her medication
for her (Tr. at 309). She gets food stamps and she has a
Medicaid card (Tr. at 309).

Plaintiff has a driver's license but she did not drive to
the hearing because she does not have a car (Tr. at 309-310).
Unless she has a migraine, she gets up every day and helps her
parents around the house (Tr. at 318). She tries to clean up;
she goes to the grocery store (Tr. at 318). Her parents are both
76 years of age (Tr. at 318). Her father does most of the
cooking, but plaintiff does some (Tr. at 319). She helps her mom
with the laundry (Tr. at 319). She goes to church every Sunday
with her parents (Tr. at 323). She visits with friends and her
four sisters (Tr. at 323).

Plaintiff is 5'2" tall and weighs about 180 pounds (Tr. at
310). She has gained about 30 pounds over the last few years
because she cannot walk around (Tr. at 310). Plaintiff used to
walk at the park, but now she has cancer sores on the bottoms of
her feet (Tr. at 319). The medical records call the sores
cellulitis, and they do not know what causes them (Tr. at 320).
She has to wear patches over the sores because they leak (Tr. at
321). Her sores can get as big the entire bottom of her foot

41

(Tr. at 321).  Her doctor told her to use over-the-counter
Neosporin on the sores (Tr. at 322).

**2.   Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of
the Administrative Law Judge.  She testified that in order for
plaintiff to return to her previous office work, she would need
to be at about 85 percent on her ability to concentrate (Tr. at
330).  If she missed more than one to one and a half days of work
per month, her job would be in jeopardy (Tr. at 330).

*V.   FINDINGS OF THE ALJ*

Administrative Law Judge Marsha Stroup entered her opinion
on October 18, 2006.

Step one.  Plaintiff has not engaged in substantial gainful
activity since her alleged onset date (Tr. at 16).

Step two.  Plaintiff suffers from high blood pressure,
migraines, and obesity, all severe impairments (Tr. at 16).

Step three.  Plaintiff's impairments do not meet or equal a
listed impairment.

Step four.  Plaintiff retains the residual functional
capacity to perform the full range of light work, subject to the
need to work only during the daytime (Tr. at 17).  With this
residual functional capacity, plaintiff can return to her past

42

relevant work as a dispatcher, customer service representative, bank encoder, or administrative assistant (Tr. at 19).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

43

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

## 1.    *PRIOR WORK RECORD*

This factor cannot be analyzed as there is no record of plaintiff's earnings in this transcript. In addition, the ALJ did not comment on plaintiff's prior work record.

## 2.    *DAILY ACTIVITIES*

Plaintiff's daily activities support the ALJ's credibility determination. In late 2004, she reported that she goes out job hunting every day to the Full Employment Council. She takes care of her mother who had a stroke several years ago. She prepares

44

her own meals, does laundry, cleans the house, organizes things in the house, and all without assistance. She goes out often, riding in a car or using public transportation. She shops, reads, and watches television.

Plaintiff admitted in her administrative paperwork that she has no difficulty with standing, sitting, reaching, lifting, talking, completing tasks, concentrating, understanding, following instructions, using her hands, or getting along with others. She reported that she was able to walk a half mile before needing to rest for ten to 15 minutes.

During the administrative hearing, plaintiff testified that she cleans up the house, goes to the grocery store, helps with the laundry, goes to church every Sunday, and visits with friends and family.

Plaintiff does not appear to be limited much, if at all, by her headaches, skin blisters, and other symptoms.

**3.   *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

This factor supports the ALJ's credibility finding. Plaintiff reported that her hobbies include reading and watching television, indicating that her concentration is intact. In fact, she stated that she is able to follow both written and verbal instructions "very well".

45

Plaintiff told Dr. Glass in September 2003 that she has episodes "every month or two where she has a severe headache and vomiting." This is significantly less frequently than she reported during her administrative testimony.

In August 2004, Dr. Lofgreen noted that plaintiff "appeared" to have "some degree" of arthritis involving her left knee; however, "the significance of this problem is not clear."

When plaintiff went to the hospital for a headache in November 2004, she was observed to be in "mild" pain due to her headache.

After plaintiff's car accident in July 2005, plaintiff was told to return to the hospital for more tests. She indicated she did not want to drive that far. She was then told to go to St. Luke's for re-evaluation, even if she needed to go by ambulance. Instead, plaintiff waited two days and followed up with Dr. Glass. This indicates plaintiff's back and neck pain from her accident were not nearly as severe as she later claimed.

On July 21, 2005, plaintiff told Dr. Glass that she had "some back pain, but not excruciating" and she said her neck was not bothering her. Indeed her range of motion in her neck was normal without tenderness.

Plaintiff said during the hearing that she has diarrhea two to three times per month; however, there is no notation of this symptom in any of the medical records.

### 4. *PRECIPITATING AND AGGRAVATING FACTORS*

This factor supports the ALJ's credibility finding. The main precipitating and aggravating factor in this record is plaintiff's narcotic use. The medical records establish that plaintiff was a regular user of narcotics from at least 1999 through 2006. She rarely walked out of a doctor's office or hospital without a prescription for some kind of narcotic.

On December 28, 2000, Dr. Lehman told plaintiff that she needed to start tapering off her codeine. "I did indicate to her that the philosophy of this clinic is not to use narcotic analgesics." About five weeks later, plaintiff saw Dr. Lehman for the last time and moved on to another doctor.

In January 2003, Dr. Arkin, a neurologist, remarked that plaintiff was suffering from withdrawal effects after running out of her narcotic pain medicine. He talked to her about the importance of not using narcotics on a daily basis. Later that month, he again talked to plaintiff about the rebound effect of using narcotics daily.

Dr. Glass saw plaintiff twice in 2003 when she did not give plaintiff a narcotic prescription, and shortly after that second

47

visit, plaintiff went to the ER and got a refill of her Percocet. Dr. Glass stated on November 7, 2002, that "long-term Percocet was not an option" and she routinely cautioned plaintiff against regular use of narcotics; however, Dr. Glass continued to prescribe Percocet regularly from that day at least through April 2006.

Plaintiff indicated that she did not wish to try any physical therapy in November 1999. In March 2001, plaintiff had non-narcotic prescriptions called in to her pharmacy but did not get the prescriptions filled. In 2003, plaintiff was referred to physical therapy but was discharged for failing to attend. In July 2005 when plaintiff had a car accident, she made a comment about the miracles of drugs after she was given a narcotic pain killer.

Dr. Glass commented on many occasions that plaintiff's regular use of narcotics was contributing to her headaches. However, plaintiff made no effort to cut down on her narcotic use, even stating incredibly in 2003 to Dr. Arkin that she does not take her muscle relaxer very often because she does not want to take too much medication. This was while she was taking four narcotic tablets per day and had been for the past several months.

The only other precipitating and aggravating factor in the record is plaintiff's shift work. Dr. Glass noted on several occasions that plaintiff's working some days and some nights prevented her from taking her medications regularly at night time, and that she would improve significantly if she could work all day shifts.

**5.**  **DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

This factor supports the ALJ's credibility finding. In September 2003, plaintiff said that Imitrex and Maxalt worked well on her headaches. Despite that, she continued to use narcotics which her doctors had explained could be making her headaches worse. Plaintiff's leg sores required only over-the-counter Neosporin. Dr. Glass noted that plaintiff's medications could cause dizziness and drowsiness, so she recommended plaintiff take them at night time.

**6.**  **FUNCTIONAL RESTRICTIONS**

This factor supports the ALJ's credibility determination. In her administrative paperwork, plaintiff indicated she had no trouble with standing, sitting, reaching, lifting, sitting, talking, completing tasks, concentrating, understanding, following instructions, using her hands, or getting along with others. She was able to walk a half a mile before needing a few-minute rest. In August 2004, plaintiff's treating physician, Dr.

49

Glass, indicated that plaintiff did <u>not</u> have a mental or physical disability which prevented her from working. In August 2004, Dr. Lofgreen stated that based on plaintiff's physical exams, it was "not possible to recommend her as incapable of working." In November 2004, a DDS physician found that plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push or pull.

In March 2006, plaintiff's treating physician, Dr. Glass, found that plaintiff would have no difficulty dealing with the stress of employment (e.g., regular and timely work scheduling, remaining on the job for eight hours, interaction with people). She found that plaintiff had no limitations with walking, standing, sitting, using her arms, using her hands, using her fingers. No doctor has ever found plaintiff's symptoms to be disabling. No doctor has ever restricted plaintiff's activities beyond a couple of days.

**B. *CREDIBILITY CONCLUSION***

In addition to the above factors, I find that the medical records establish that plaintiff's symptoms are not disabling, and that there are almost no objective findings anywhere in this record. In January 2000, plaintiff had an MRI which was normal, and she was diagnosed with headaches, "etiology undetermined."

50

In December 2000, plaintiff was observed to have tight paraspinal and trapezius muscles, but had full power in her arms and legs, normal reflexes, normal coordination, normal gait, and normal sensation. She had an abdominal series which was normal. On December 28, 2000, plaintiff's physical exam was normal. In November 2003 her lumbar active range of motion was within normal limits. In July 2004 she had a normal colonoscopy, a normal small bowel follow-through, normal CT scans of her abdomen and pelvis, and a normal nuclear medicine emptying study. In August 2004, she had tenderness in her left knee, but her gait was normal. The following month, she had a knee film which showed only some mild arthritic changes.

Even after plaintiff's car accident in July 2005, she had normal hip and cervical spine x-rays, and a CT scan of her lumbar spine was negative. In February 2006, x-rays of her left heel were normal.

Plaintiff had markedly elevated blood pressure when she stopped taking her medication. She was noted to have a history of deficiency anemia, and was noted to be one "who really does not comply with her iron medication."

Plaintiff noted in her Disability Report that she frequently had to be hospitalized, and that was why she was unable to work. However, the records show that plaintiff was seen in the

emergency room three times (once after a car accident) and was hospitalized one time for nausea and vomiting. Two of plaintiff's emergency room visits occurred <u>after</u> she reported to Disability Determinations that her frequent hospitalizations were what prevented her from working.

Plaintiff reported in her disability paperwork that she has to get blood transfusions every two weeks; however, there is only one blood transfusion that is reflected in this entire transcript.

Plaintiff told Dr. Scarbrough at St. Luke's Hospital on November 3, 2004, that she had blacked out four to five times over the past two weeks. Yet, plaintiff saw Dr. Glass, her treating physician, on October 26, 2004 -- just eight days earlier, and she never mentioned anything about the black outs she was allegedly experiencing.

Plaintiff has not been willing to try anything to reduce her pain other than narcotic pain medicine. She was reluctant to use muscle relaxers regularly, she failed to fill non-narcotic prescriptions called in to the pharmacy by her doctor, she refused physical therapy in 1999, she was referred for physical therapy in June 2003 and in August 2003 but there are no records of her going to physical therapy until December 2003 when she was discharged for failing to show up. She was encouraged on several

52

occasions to see a dermatologist for the blisters on her legs, but there is no evidence she ever did that.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not credible. Therefore, her motion for summary judgment on this basis will be denied.

## VII. CONTROLLING WEIGHT TO TREATING PHYSICIAN

Plaintiff next argues that the ALJ erred in failing to give controlling weight to plaintiff's treating physician, Cynthia Glass, M.D. Plaintiff argues that Dr. Glass "opined that chronic pain from [plaintiff's] head and her neck, as well as fatigue would constantly interfere with Ms. Moore's ability to maintain attention and sustain concentration. Dr. Glass further opined that Ms. Moore may experience drowsiness and dizziness as side effects of her pain medications. As a result of her impairments and/or the treatment of her impairments, Dr. Glass believed that Ms. Moore would likely be absent from work more than four days per month."

A treating physician's opinion is generally entitled to substantial weight. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The regulations provide that "if we find that a treating source's opinion on the issue(s) of the nature and

53

severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527.

In this case, Dr. Glass's opinion was that plaintiff was not disabled. Her speculation that plaintiff was likely to miss four days of work per month is not supported by anything in her own medical records or the records of any other physician. Plaintiff saw Dr. Glass about her alleged impairments in November 2002, April 2003, June 2003, August 2003, September 2003 (twice), October 2003, August 2004, October 2004, November 2004, March 2005, June 2005, July 2005 after her car accident, and February 2006 -- a visit that was really her father's doctor's appointment but plaintiff chose to talk to Dr. Glass about her blisters at that time. There were significant blocks of time during which plaintiff was NOT being seen by Dr. Glass -- five months between November 2002 and April 2003, ten months between October 2003 and August 2004, four months between November 2004 and March 2005, three months between March 2005 and June 2005, seven months between July 2005 and February 2006. Therefore, the frequency of plaintiff's visits to see Dr. Glass clearly do not support her opinion that plaintiff would miss four days of work per week.

54

Dr. Glass found that plaintiff would <u>not</u> have difficulty with regular and timely work schedules, remaining on the job for eight hours, or interacting with people. She found that plaintiff had no limitations in walking, standing, sitting, using her arms, using her hands, using her fingers. With regard to side effects of medication, Dr. Glass commented that plaintiff needed to work daytime hours so she could take her medications at night. Dr. Glass did not ever opine that plaintiff could not work. She set out all of plaintiff's limitations (of which there were very few), stated that plaintiff needed to work daytime hours, and then merely speculated that plaintiff might be likely to miss four days of work per month.

Plaintiff argues that her lack of concentration is the cause of her likelihood of missing four or more days of work per month. However, plaintiff herself indicated that she had no problem with concentration, which is additional evidence that Dr. Glass's speculation is not supported by any evidence.

Dr. Glass did not suggest that plaintiff is disabled or incapable of working, but only limited her working to daytime hours. The ALJ discounted only Dr. Glass's speculation that plaintiff would be likely to miss four days of work per month. This statement that plaintiff was likely to miss four days of work per month was due to "bad days", not to side effects of

medication or any specific impairment.  A speculation based on "bad days" is not the type of treating physician opinion contemplated by the regulations.

## VIII. PLAINTIFF'S SKIN ULCERS

Plaintiff next argues that the ALJ erred in finding that plaintiff's skin ulcers were not a severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> (2)  Capacities for seeing, hearing, and speaking;

> (3)  Understanding, carrying out, and remembering simple instructions;

> (4)  Use of judgment;

56

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by her skin ulcers.

Plaintiff first saw her doctor on October 26, 2004, due to a ruptured blister on her hip (Tr. at 196). On November 3, 2004, she was seen in the ER for a migraine headache, but also talked about the blister that appeared on her hip several days earlier. Dr. Scarbrough believed it was a spider bite. Plaintiff saw Dr. Glass on November 22, 2004, and Dr. Glass mentioned an ulcer on plaintiff's lateral left thigh. She does not mention the ulcer on plaintiff's hip from a few weeks earlier, so I cannot tell if this was another ulcer after the first one healed, or whether this was the same one.

By March 2005, Dr. Glass observed that plaintiff's hip ulcer ended up being shingles and it was almost healed. Up to this point, neither of the doctors who saw plaintiff's ulcer noted any physical limitations caused by the ulcer. In addition, because this ulcer was not on plaintiff's feet, there can be no assumption that her ability to stand or walk was affected by it.

Case 4:07-cv-00318-REL   Document 12   Filed 03/12/08   Page 57 of 64

The next mention of ulcers did not occur for almost a year. On February 1, 2006, plaintiff took her father to the doctor. She mentioned that she had had a problem "over the past year almost" with recurrent ulcerations of her skin. Plaintiff had seen Dr. Glass in June 2005 without mentioning the skin ulcers, she was seen at Western Missouri Medical Center and by Dr. Glass in July 2005 without mentioning the skin ulcers, she saw Dr. Varriano in October 2005 without mentioning skin ulcers. In November 2005 plaintiff had a "wound culture" done from her right ankle. There is no referring doctor listed, and I have been able to find no medical records from any doctor who ordered that this test be done. Therefore, I cannot even tell if this is the same type of skin ulcer or some other type of wound. In any event, it was not on plaintiff's feet.

Because there were no complaints of skin ulcers during that year, the ALJ was justified in concluding that if plaintiff experienced the ulcers during that time, they did not cause her any significant problems.

The first report of ulcers on plaintiff's feet was on February 1, 2006. Plaintiff had ulcers on her heels. However, she did not schedule a doctor's appointment because of them. Instead, she was taking her father to the doctor about his blood pressure and mentioned the ulcers while she was there. Clearly

58

plaintiff was able to get around despite the ulcers being on her heels. Dr. Glass told plaintiff to go through the phone book and start calling dermatologists to find one that takes Medicaid. Apparently plaintiff did not do this, because on April 5, 2006, Dr. Glass again urged plaintiff to find a dermatologist. By April 5, 2006, Dr. Glass noted that plaintiff's two leg ulcers had improved.

There is no evidence that plaintiff's skin ulcers interfered with her ability to walk; stand; sit; lift; push; pull; reach; handle; carry; see; hear; speak; understand, carry out, or remember simple instructions; use judgment; respond appropriately to supervision, co-workers, and usual work situations; or deal with changes in a routine work setting. In fact, plaintiff's treating physician, Dr. Glass, who was aware of plaintiff's skin ulcers, completed a Residual Functional Capacity questionnaire on March 14, 2006, and did not include skin ulcers as a diagnosis. She found that plaintiff would have no difficulty dealing with the stress of employment, with a regular and timely work schedule, with remaining on the job for eight hours, with interacting with people. She found that plaintiff had no difficulty walking, standing, sitting. She found that plaintiff had no difficulty using her arms, hands, or fingers.

59

During the administrative hearing on August 8, 2006, plaintiff testified that the only problem she had with driving was that the medications she takes at night make her drowsy, so she would need to drive only during the day. She did not indicate that her skin ulcers interfere with her ability to drive, and indeed she was driving in Concordia -- about an hour outside of Kansas City -- during the time she was experiencing these ulcers. Plaintiff was clearly able to press down on the gas pedal and brake with her feet, indicating that the ulcers were not serious then.

Although plaintiff testified that she is unable to walk because of the ulcers on her feet, the record does not support that allegation. Plaintiff had few doctor visits during the time she was experiencing these skin ulcers, almost all of the ulcers were on her legs or ankles and not on her feet, and there is no evidence that her activities were limited during this time. Her own treating physician did not list skin ulcers as a diagnosis and failed to find any limitations at all as a result of the skin ulcers.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's skin ulcers do not amount to a severe impairment.

60

## IX. *RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT*

Finally, plaintiff argues that the ALJ erred in failing to make a specific residual functional capacity finding. "In the instant case, the ALJ made no findings of any functional limitations or restrictions. There was no discussion as to Ms. Moore's ability to sit, stand, walk, push, pull, lift or carry, or any other postural or manipulative functioning. Moreover, there was no discussion as to any mental limitations Ms. Moore may be suffering, such as pain-related deficits in concentration or persistence."

Residual functional capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545(a) and 416.945(a). It is an assessment based on all of the relevant evidence including a claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. 20 C.F.R. §§ 404.1545(a) and 416.945(a). The responsibility for determining a claimant's RFC lies with the ALJ. 20 C.F.R. §§ 404.1546(c) and 416.946(c).

The ALJ found that plaintiff could perform the full range of light work, subject only to the need to work during the daytime. Light work is defined as requiring lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds and a good deal of walking or standing. 20

C.F.R. §§ 404.1567(b) and 416.967(b).  Where all of the functions that the ALJ specifically addressed in the RFC were those in which she found a limitation, a court can reasonably believe that those functions that she omitted were those that were not limited.  <u>Depover v. Barnhard</u>, 349 F.3d 563, 567 (8th Cir. 2003).

In this case, the ALJ's residual functional capacity assessment is no different from the RFC assessed by plaintiff's treating physician.  Dr. Glass found no limitation in plaintiff's ability to sit, stand, walk, push, pull, reach, use her arms, use her hands, use her fingers.  She found that plaintiff would have no difficulty dealing with the stress of employment, including regular and timely work schedule, remaining on the job for eight hours, and interacting with people.  She indicated that plaintiff needed daytime hours because she needed to take medication every night which caused drowsiness.  This is consistent with Dr. Glass's medical records over the years when she recommended that plaintiff stop working the rotating shifts because that schedule was interfering with her ability to take her medication on a daily basis.

And Dr. Glass's assessments of plaintiff's abilities and limitations are consistent with the other evidence in the record. In her administrative paperwork, plaintiff indicated she had no trouble with standing, sitting, reaching, lifting, sitting,

62

talking, completing tasks, concentrating, understanding, following instructions, using her hands, or getting along with others.  She was able to walk a half a mile before needing a few-minute rest.  In August 2004, plaintiff's treating physician, Dr. Glass, indicated that plaintiff did <u>not</u> have a mental or physical disability which prevented her from working.  In August 2004, Dr. Lofgreen stated that based on plaintiff's physical exams, it was "not possible to recommend her as incapable of working."  In November 2004, a DDS physician found that plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push or pull.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## X.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

63

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 12, 2008